Approved: _____
                 NICHOLAS S. BRADLEY
                 Assistant United States Attorney

Before:   THE HONORABLE PAUL E. DAVISON            20 MJ 7281
          United States Magistrate Judge
          Southern District of New York

- - - - - - - - - - - - - - - - - - - - - X
                                          :    **SEALED COMPLAINT**
UNITED STATES OF AMERICA                  :
                                          :    Violations of
     - v. -                               :    18 U.S.C. §§ 1343,
                                          :    1349, and 2
ANTHONY RICCARDI,                         :
PATRICIA RICCARDI,                        :
ERIN VERESPY, and                         :
VANESSA BATTLE,                           :
                                          :    COUNTY OF OFFENSE:
                        Defendants.       :    WESTCHESTER
- - - - - - - - - - - - - - - - - - - - - X

SOUTHERN DISTRICT OF NEW YORK, ss.:

        GREG T. GHIOZZI, being duly sworn, deposes and says
that he is a Postal Inspector with the United States Postal
Inspection Service ("USPIS"), and charges as follows:

                        COUNT ONE
             (Conspiracy to Commit Wire Fraud)

        1.   From at least in or about 2015 through at least
in or about 2019, in the Southern District of New York and
elsewhere, ANTHONY RICCARDI, PATRICIA RICCARDI, ERIN VERESPY,
and VANESSA BATTLE, the defendants, and others known and
unknown, willfully and knowingly, did combine, conspire,
confederate, and agree together and with each other to commit
wire fraud, in violation of Title 18, United States Code,
Section 1343.

        2.   It was a part and an object of the conspiracy
that ANTHONY RICCARDI, PATRICIA RICCARDI, ERIN VERESPY, and
VANESSA BATTLE, the defendants, and others known and unknown,
willfully and knowingly, having devised and intending to devise
a scheme and artifice to defraud and for obtaining money and
property by means of false and fraudulent pretenses,
representations, and promises, would and did transmit and cause

to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

(Title 18, United States Code, Section 1349.)

## COUNT TWO
(Wire Fraud)

3.    From at least in or about 2015 up to and including at least in or about 2019, in the Southern District of New York and elsewhere, ANTHONY RICCARDI, PATRICIA RICCARDI, ERIN VERESPY, and VANESSA BATTLE, the defendants, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, ANTHONY RICCARDI, PATRICIA RICCARDI, VERESPY, and BATTLE, through fraud and deceit, and through emails that traveled interstate, engaged in a scheme to misappropriate and steal millions of dollars in client funds that were transferred in interstate wire payments and intended solely for payment of employee healthcare claims.

(Title 18, United States Code, Section 1343 and 2.)

The bases for my knowledge and for the foregoing charge are, in part, as follows:

4.    I am a Postal Inspector with the USPIS.  I have been personally involved in the investigation of this matter. This affidavit is based upon my personal participation in the investigation of this matter, my conversations with other law enforcement agents, witnesses, and others, and on my examination of various reports and records.  Because this affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during the course of my investigation.  Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.  Where figures,

calculations, and dates are set forth herein, they are approximate, unless stated otherwise.

5.    Based on my participation in this investigation, my conversations with other law enforcement officers and other individuals (including victims), and my review of documents (including bank records and emails), I have learned the following, among other things:

## I.    BACKGROUND

6.    ANTHONY RICCARDI, PATRICIA RICCARDI, ERIN VERESPY, and VANESSA BATTLE, the defendants, are managers and employees of an entity called Employee Benefit Solutions LLC ("EBS"), based in the vicinity of Wilton, Connecticut. EBS offered a variety of insurance-related services to clients, including customers based in the Southern District of New York. Based on my review of documents and records in this investigation, I have learned that at all relevant times in this Complaint:

a.    ANTHONY RICCARDI was the Executive Vice President of EBS and held a fifty percent ownership of the company.  As detailed below, ANTHONY RICCARDI interacted directly with clients and, among other things, sent altered bank statements to a client to conceal the fraudulent scheme. ANTHONY RICCARDI also directed other defendants, such as BATTLE, to assist in the execution of the scheme.

b.    PATRICIA RICCARDI was the President of EBS and the other fifty percent owner of the company.  As detailed below, PATRICIA RICCARDI, among other things, worked with ANTHONY RICCARDI and VERESPY to divert client healthcare funds for personal expenses and assisted in efforts to conceal the fraud from their clients.

c.    ERIN VERESPY served as an outside accountant for EBS before becoming the Chief Financial Officer of the company beginning in or about July 2017.  As detailed below, VERESPY monitored EBS finances and assisted ANTHONY RICCARDI and PATRICIA RICCARDI in furthering and concealing the fraudulent scheme.

d.    VANESSA BATTLE was the Vice President of Client Services at EBS.  As detailed below, BATTLE played a significant role in creating fraudulent statements for

3

healthcare claims and expenses at the direction of ANTHONY
RICCARDI.

7.    At all times during the fraudulent scheme
detailed in this Complaint, EBS, through ANTHONY RICCARDI,
PATRICIA RICCARDI, ERIN VERESPY, and VANESSA BATTLE, the
defendants, represented that it provided (i) third party claims
administration services, and (ii) brokerage of "stop-loss"
insurance policies to companies that elect to self-insure (or
self-fund) their employee healthcare plans.

8.    Based on my review of reports and records in this
case, as well as my discussion with witnesses, I have learned
the following:

a.    **Self-Funded Healthcare**: Companies that elect
to self-fund (or self-insure) their employee healthcare plans
generally pay the full price of their share of healthcare claims
submitted to healthcare insurance carriers on behalf of their
employees.  Based on my review of the EBS website, EBS described
a "self-funded healthcare plan" as a "way for employers to
create their own medical coverage plan by paying for their own
losses up to a certain amount."

b.    **Third Party Claims Administration Services:**
Some companies with self-funded healthcare plans will
administer, process, and pay healthcare claims for their
employees internally.  Other companies with self-funded
healthcare plans will retain the services of a third party
administrator (or "TPA") that will administer various aspects of
the claims processing, payment, and submission process on a
specific company's behalf in exchange for various administrative
fees. EBS advertised, offered and provided TPA services to its
customers.

c.    **Brokerage of Stop-Loss Insurance:**  Stop-loss
insurance is a means through which some companies with self-
funded healthcare plans minimize potential claims exposure when
paying their employees' health benefits.  When a company obtains
stop-loss insurance, it generally pays a monthly premium to the
insurance producer.  When an employee's healthcare costs exceed
the liability threshold under the policy (due to chronic
illness, for example), the company can file a claim under the
stop-loss policy for reimbursement. EBS advertised and brokered
stop-loss insurance policies to its customers.

4

## II.   THE CLAIMS ADMINISTRATION SCHEME

9.    Based on my review of documents and records in
this investigation, as well as my interviews with witnesses, I
have learned that EBS represented an automobile dealership chain
("Company-1") headquartered in Westchester County, New York.  At
all relevant times, Company-1 had a self-funded healthcare plan
for a significant portion of its employees and corporate staff,
including those in the Southern District of New York.  Since at
least in or about 2015, EBS served as both a TPA for Company-1,
as well as a broker for stop-loss insurance policies.  This
means that not only did EBS broker stop-loss insurance policies
on Company-1's behalf, EBS would also receive, process, and pay
claims to medical providers for healthcare services rendered for
Company-1's employees.  In exchange for these services, Company-
1 agreed to pay EBS a monthly administrative fee based, among
other things, on the number of employees covered by the health
plan.

10.    EBS, in its capacity as Company-1's TPA, would
generate bimonthly invoices for Company-1 that listed all the
expenses submitted to EBS by healthcare providers for Company-1
employees during the two-week invoice period that EBS was
prepared to pay on Company-1's behalf.  This bimonthly invoice
was generally referred to by EBS and Company-1 employees as the
"check register."  In other words, each biweekly check register
purported to show all of the check payments EBS was preparing to
make to healthcare providers on behalf of Company-1 for that
period, listed by check number.  The sum total of all the
payments on the check register was the total invoice amount that
Company-1 needed to fund for that biweekly period.

11.    Upon receiving each check register and invoice,
Company-1 would "fund" the check register by sending a wire
transfer for the total invoiced amount to a bank account
controlled by EBS for the express purpose of administering
Company-1's employee healthcare claims (the "Company-1 EBS
Account.").

12.    I have spoken with the Company-1 Chief Financial
Officer ("Company-1 CFO") in connection with this investigation.
According to the Company-1 CFO, Company-1 management believed,
consistent with the language in the parties' administration
contracts, that upon funding each biweekly check register, EBS
would issue timely payments to healthcare providers for all the
claims listed in the check register for that period.  The
Company-1 CFO understood that the Company-1 EBS Account, which

5

was funded through wires paid by Company-1, was a fiduciary account exclusively used to pay Company-1 healthcare claims.[1] Other payments to EBS, such as the monthly administrative fees mentioned above, were paid by Company-1 into a different account.

13.   I have reviewed images of checks that were paid from the Company-1 EBS Account by EBS to healthcare providers. The information in the top left corner of the checks states that they were issued by "EMPLOYEE BENEFIT SOLUTIONS, ON BEHALF OF [COMPANY-1] HEALTH CARE PLAN."

14.   As part of this investigation, I and other law enforcement agents have reviewed the biweekly check registers that EBS sent to Company-1 dating back to 2015. Based on my review, the invoice balance due amount on each invoice is equal to the sum of all the claims listed on the check registers, which bear Company-1's name and are generated by EBS. Each check register lists, among other items, the names of the payee (i.e., the healthcare providers), the check amount, and the check number associated with each healthcare-related claim for Company-1 employees during the biweekly invoice period.

15.   Based on my review of the Company-1 check registers and the Company-1 EBS Account records, I have learned that approximately $26 million was transferred from Company-1 to the Company-1 EBS Account between in or about 2015 and in or about 2019. Such payments were made by Company-1 to fund the healthcare payments that EBS was ostensibly planning to pay to healthcare providers as Company-1's TPA.

16.   However, as detailed below, based on my review of documents and records in this case, including the aforementioned check registers and bank records, I have learned that a large number of checks listed in the check registers that were invoiced by EBS and funded by Company-1 were never actually deposited by the payee (i.e., the billing healthcare providers):

a.   For example, I have reviewed an EBS check register and invoice addressed to Company-1 dated July 14, 2017

---

[1]   In approximately April 2019, at the request of ANTHONY RICCARDI, the defendant, Company-1 began sending all check register wire transfers to different bank accounts. Based on my review of these additional bank account records, I have identified similar discrepancies and evidence of misappropriation of Company-1 funds by the defendants.

with a balance due of $336,146.77.  The accompanying check
register lists approximately 57 distinct check numbers
associated with Company-1 employee healthcare expenses with
amounts totaling $336,146.77.  Based on my review of bank
records, on or about July 14, 2017, $336,146.77 was wired from
Company-1 to the Company-1 EBS Account to satisfy the invoice.
The wire information associated with the transfer shows that
Company-1 wired the funds interstate from its offices in
Westchester County, New York to EBS, which is located in Wilton,
Connecticut.[2]

          b.    However, based on my review of the Company-1
EBS Account records, of those 57 distinct check numbers, only 37
appear to have been deposited by the payee healthcare providers,
totaling only approximately $47,434.50.  In other words, there
is no record of the other 20 checks totaling the remaining
approximate $288,712.27 in the Company-1 EBS Account.

          c.    In fact, based on my review of account
records, I know that on or about July 14, 2017, EBS withdrew
approximately $50,000 of the $336,146.77 that Company-1 wired to
the Company-1 EBS Account and transferred it to the EBS
operating account in three separate transfers.  One of those
transfers was for approximately $12,247.24.  On the same date, a
check for $12,247.24 was issued from the operating account to a
bank that was used to make a home mortgage payment for ANTHONY
RICCARDI and PATRICIA RICCARDI, the defendants.  The check for
the mortgage payment was signed by PATRICIA RICCARDI.  The
second transfer to the EBS operating account on or about July
14, 2017 was for $29,192.49.  Based on my review of the EBS
operating account records, I know that two payments were made
that same day to American Express totaling $29,192.49, one to
the RICCARDI's personal credit card account, and the other to an
EBS account.  The charges covered by these payments included,
among other things, personal expenses relating to boating and
golf.

          d.    I have identified examples of this pattern
dating back to at least 2015.  For instance, a January 2015
check register addressed to Company-1 shows 102 distinct check
numbers.  However, according to Company-1 EBS Account records,
only 80 checks associated with those check numbers were actually

---

[2]    The July 14, 2017 check register was also emailed
interstate on or about July 14, 2017 by an EBS employee located
in Wilton, Connecticut to an employee of Company-1, whose
offices are in Westchester County, New York.

deposited after Company-1 paid the invoice associated with that check register.

   e.   Indeed, of the approximately $26 million that Company-1 paid to EBS between in or about 2015 and through in or about 2019 into the Company-1 EBS Account, only approximately $8.14 million was actually deposited by the payee healthcare providers.  The remaining check register payments, approximately $17.87 million, appear to have been misappropriated, with the overwhelming majority of the funds transferred into the EBS operating account without the knowledge of Company-1 and not used to pay healthcare expenses. As part of my investigation, I have reviewed and analyzed the account records for both the Company-1 EBS Account, as well as the EBS operating account, and have spoken with other law enforcement agents who have done the same.

   17.   As detailed below, based on my participation in the investigation, my review of documents and records, and my discussions with witnesses and other law enforcement agents, I have learned that ANTHONY RICCARDI, PATRICIA RICCARDI, VANESSA BATTLE, and ERIN VERESPY, the defendants, engaged in a scheme to misappropriate and steal approximately $17.87 million in Company-1 check register payments between in or about 2015 and in or about 2019 (The "Claims Administration Scheme").  The scheme included, among other things, the creation of false and fraudulent healthcare claims in the check registers in order to defraud Company-1 and other healthcare providers, as well as the slow payment and non-payment of legitimate claims.  The defendants also actively took steps to conceal their scheme, including through the creation of false bank statements and checks.

## A. EXAMPLES OF DEFENDANTS MISAPPROPRIATING COMPANY-1 PAYMENTS

   18.   Based on my review of bank records in this case, I know that between in or about 2015 through in or about 2019, there were approximately 429 outgoing payments made from the Company-1 EBS Account into the EBS operating account, totaling approximately $18.3 million of the approximately $26 million in healthcare claim payments made by Company-1.[3]

---

[3]   During this same period, it appears there were approximately 69 payments made from the EBS operating account into the Company-1 EBS Account, totaling approximately $1.36 million.

19.    For example, on or about September 6, 2017, an EBS employee working as a personal assistant to ANTHONY RICCARDI, the defendant ("CC-1") emailed ERIN VERESPY, the defendant, asking "[o]ne more thing, [Company-1] funded yesterday and Anthony wants to know if we can transfer $50,000 from [Company-1] to operating?"  Based on my review of documents and records in this case, as well as my interviews with Company-1 employees, I believe "funded" refers to EBS receiving a check register payment from Company-1.  In response, VERESPY writes "Yes, I will do that later as well when I transfer for Amex payment and rent."  Later that afternoon, CC-1 emailed VERESPY stating "FYI, Tricia [i.e. PATRICIA RICCARDI] Paid the Amex and I transferred the money."  CC-1 sent a follow-up email to VERESPY stating "Transferred $2,300.00 from operating to chase AGC for Anthony's golf trip today."

20.    The bank records that I and other law enforcement agents have reviewed in this investigation corroborate the above discussion.  Specifically, on or about September 5, 2017, Company-1 wired approximately $282,474.93 into the Company-1 EBS Account as payment for employee healthcare claims.  That same day, approximately $42,000 was transferred to the EBS operating account.  Furthermore, on or about September 6, 2017, approximately $92,658.64 was transferred from the Company-1 EBS Account to the EBS operating account, from which a payment was made in the same amount to American Express.  Finally, on or about September 6, 2017, approximately $2,300 was transferred from the EBS operating account to another bank account controlled by EBS.

21.    Additionally, on or about July 13, 2017, ANTHONY RICCARDI, the defendant, emailed ERIN VERESPY, the defendant, copying PATRICIA RICCCARDI, the defendant, in an email entitled "Budget."  The email attached a spreadsheet titled "Budget through 0722117," which described "Payment [sic] and expected to go out by next Friday."  One of the four "source[s]" of income described in this budget document is "Company-1," with a line item of $355,000.  Below these supposed income sources were expected payments, including but not limited to $140,000 to VERESPY, $30,000 for "Amex," and $25,000 for "payroll+Tax."  At the bottom of this spreadsheet, highlighted in bold, is the statement: "Left over for claims $240,500."[4]

---

4    The day after this email, on or about July 14, 2017, EBS received a wire payment from Company-1 to fund a check register in the Company-1 EBS Account for approximately $336,146.77.  EBS

22.   I also know from my review of documents and records in this case that the small fraction of healthcare payments that EBS actually did make on behalf of Company-1 (approximately $8.14 million of $26 million) were substantially delayed, unbeknownst to Company-1, which expected timely payment of its employee health expenses after it wired the biweekly check register funds into the Company-1 EBS Account. Specifically, Company-1 EBS Account records show an average of 95 days elapsed between Company-1's funding of each check register and the actual depositing of checks by healthcare providers.

23.   Based on my review of documents and records in this case, I believe that ANTHONY RICCARDI, PATRICIA RICCARDI, VANESSA BATTLE, and ERIN VERESPY, the defendants, made decisions on what few Company-1 healthcare claims they did pay based on which healthcare providers were likely to complain if they did not receive payment, and on whether the claims were connected to Company-1 executives.   Based on my discussions with the Company-1 CFO, I know that Company-1 offered its senior executives and management a premium healthcare plan that EBS also administered as a TPA.

24.   As part of this investigation, I have reviewed a text message thread between PATRICIA RICCARDI and ERIN VERESPY, the defendants, on or about September 6, 2017.   In this conversation, RICCARDI and VERESPY discussed, among other things, the timing of healthcare checks for "vips" and justified payment for "not VIP" claims due to healthcare providers complaining:

| | |
|---|---|
| P. RICCARDI: | Hi Erin.  We are mailing checks for vips today – do you want the totals? |
| VERESPY: | Yes please. |
| P. RICCARDI: | 17,817.44[,] 56,568.57[,] 25,308.56[,] Total: 99,994.57 |
| VERESPY: | Ok[.]  All [Company-1]? |
| P. RICCARDI: | And I have a [Company-2] claim. 2540.30 . . . This one they called anthony [RICCARDI] on and he said to send it. |

---

banking records from its operating account then show payments made to entities in the "Budget" spreadsheet, including approximately $29,192.49 to American Express, as detailed above.

| | |
|---|---|
| P. RICCARDI: | Let me know if it's ok and then I will Mail. |
| VERESPY: | Ok that's fine. I know they have to go out.  Send today! |
| P. RICCARDI: | Can you make the transfers |
| VERESPY: | Yes I will |
| P. RICCARDI: | To [Company-1] and [Company-2] |
| P. RICCARDI: | Is there a possibility we could send out 6402.62 on [Company-1]??? These are threatening phone calls.  Not VIP tho. |
| VERESPY: | Can it wait until tomorrow? I have to run some numbers because out [sic] cash is getting low. |
| P. RICCARDI: | Sure.  We can wait!! |

25.    An additional text message thread I have reviewed from on or about December 13, 2018 and December 14, 2018 between PATRICIA RICCARDI and ERIN VERESPY, the defendants, further illustrates how the defendants diverted Company-1 funds for payment of non-healthcare expenses:

| | |
|---|---|
| P. RICCARDI: | Hey you can I get 2200 To pay the audio guy ?? |
| P. RICCARDI: | I will text Anthony [RICCARDI] thanks |
| P. RICCARDI: | Erin sorry I forgot you were t in the office and were with Vanessa [BATTLE] sorry I sent an email to you and Anthony with it . . . . thank you.  And my apologizes |
| VERESPY: | No worries.  I saw it but then forgot about it.  Long week.  I should have money once [Company-1] funds for you. Nothing right now unfortunately. |
| P. RICCARDI: | Ok.  Thank you |

26.    Based on my discussions with the Company-1 CFO, I have learned that at least one healthcare provider has sued Company-1 for nonpayment, and that some Company-1 employees have been contacted by collections agencies due to non-payment of healthcare expenses.

27.    I have also spoken with a former employee of EBS ("Witness-1") who corroborated the slow payment or non-payment of claims by EBS.  Witness-1 worked in various capacities at EBS beginning in or about 2014, including claims administration, before resigning in or about 2017.  Witness-1 reported that beginning in or about late 2015, ANTHONY RICCARDI, the

11

defendant, instructed Witness-1 to set aside any checks for payment of healthcare claims that were over $1,000 and provide them to RICCARDI instead of sending them out directly.  RICCARDI asked Witness-1 to do this on more than one occasion.

28.   Witness-1 also explained that toward the end of his/her employment at EBS, the office received a significant volume of calls from healthcare providers complaining about unpaid claims.  According to Witness-1, ANTHONY RICCARDI and VANESSA BATTLE, the defendants, instructed Witness-1 to talk to complaining callers and present himself/herself as the manager of EBS.  RICCARDI and BATTLE told Witness-1 to tell callers that the checks must have been lost in the mail and that payments would need to be reissued.  Witness-1 was also told to state he/she was unsure when the reissued payment would be made.  Witness-1 also saw PATRICIA RICCARDI, the defendant, in the EBS office while he/she was fielding complaint calls.

B. **EXAMPLES OF DEFENDANTS CREATING FALSE HEALTHCARE CLAIMS**

29.   Based on my review of documents and records in this case, I respectfully submit that ANTHONY RICCARDI, PATRICIA RICCARDI, VANESSA BATTLE, and ERIN VERESPY, the defendants, also furthered the Claims Administration Scheme by creating false and fictitious healthcare claims for services that were never rendered and presenting them for payment on Company-1 check registers.

30.   Based on my review of reports and records in this investigation, and my discussion with a contractor for EBS during the relevant time period, I have learned that EBS utilized claims processing software with servers based in the vicinity of Las Vegas, Nevada (the "Claims Software").  The Claims Software was used by EBS to compile records of healthcare claims submitted by providers for services rendered on employees of clients such as Company-1.  Although EBS contracted with an offshore company to input most of the relevant data into the Claims Software, EBS employees, including VANESSA BATTLE, the defendant, could manually input claims as well.

31.   As part of this investigation, I have spoken with representatives of a pharmacy network ("Pharmacy-1") that appeared on multiple Company-1 check registers generated by EBS dating back to in or about January 2015.  In total, the Company-1 check registers generated by EBS show that Pharmacy-1 purportedly submitted approximately $5.6 million in claims relating to Company-1 employees between in or about 2015 and the

12

present.   Based on my review of the Claims Software records, I
know that the majority of these entries relating to Pharmacy-1
claims were manually entered by VANESSA BATTLE, the defendant.

32.   As part of my investigation, I have obtained
records from Pharmacy-1 that show all pharmacy claims that
Pharmacy-1 submitted to EBS relating to Company-1 employees
during this same time period.   In reality, and unbeknownst to
Company-1, the actual billing records show that Pharmacy-1
submitted only approximately $2.5 million in claims to EBS
relating to Company-1.   Accordingly, approximately $3.1 million
in Pharmacy-1 claims included in the Company-1 check registers
dating back to 2015 were false.

33.   As part of this investigation, I have also
identified evidence that VANESSA BATTLE, the defendant,
submitted false information to an auditor in 2017 regarding
Pharmacy-1 claims that EBS ostensibly paid on Company-1's
behalf.   Specifically, on or about December 8, 2017, BATTLE sent
an email to an auditor for the underwriter of Company-1's stop-
loss insurance policy (the "Auditor").   BATTLE's email attached
a document purporting to show a series of Pharmacy-1 claims that
EBS paid on behalf of Company-1 employees for a certain time
period.

34.   Based on records I have obtained from Pharmacy-1,
I was able to compare the invoice numbers and dates from
Pharmacy-1's claims system against the same invoice numbers and
dates that VANESSA BATTLE, the defendant, sent to the Auditor.
This review revealed substantial discrepancies between what EBS
actually paid Pharmacy-1 for certain claims compared to what
BATTLE represented to the Auditor:

a.   For example, BATTLE's report for the Auditor
showed a June 19, 2017 claim for approximately $274,328.09.
Pharmacy-1's records show that same claim was actually for
approximately $2,646.68.

b.   I have identified multiple additional
examples of these payment discrepancies.

c.   Each of the fictitious claims displayed on
BATTLE's report to the Auditor corresponds with the claim
amounts that EBS, through the defendants, invoiced to Company-1
in its biweekly check registers, which Company-1 then funded
through wire transfers to the Company-1 EBS Account.

13

35.    As part of this investigation, I have also identified evidence that ANTHONY RICCARDI, the defendant, directed attempts by EBS, including through VANESSA BATTLE, the defendant, to inflate Company-1 check register invoices through the creation of false and fictitious healthcare claims.   For example, I have reviewed an email sent by VANESSA BATTLE, the defendant, on or about October 31, 2017, to a contractor retained by EBS to assist with the Claims Software.   In that email, BATTLE writes that "Anthony [RICCARDI] gives me an amount that he wants for the check register and I have to make sure we have that number."

## C. DEFENDANTS' STEPS TO CONCEAL THE CLAIMS ADMINISTRATION SCHEME

36.    As part of this investigation, which included my review of documents and records as well as witness interviews, I have learned that ANTHONY RICCARDI, PATRICIA RICCARDI, ERIN VERESPY, and VANESSA BATTLE, the defendants, also took steps to conceal the extent of the Claims Administration Scheme from Company-1, including through manipulated and fabricated bank statements sent to Company-1 to provide the false appearance that healthcare claims were being paid by EBS, when in reality they were not.

37.    For example, on or about January 18, 2019, the Company-1 CFO emailed ANTHONY RICCARDI, the defendant, requesting bank statements from the Company-1 EBS Account from 2018.   Based on my interviews with the Company-1 CFO, I have learned that the request was made in part due to concerns at Company-1 over healthcare claims not being paid.   As explained above, it was Company-1's understanding, consistent with the administration contracts I have reviewed, that the Company-1 EBS Account was a fiduciary account used only to fund and promptly pay its employees' healthcare expenses.

38.    On or about January 20, 2019, shortly after receiving the email from the Company-1 CFO, ANTHONY RICCARDI and ERIN VERESPY, the defendants, exchanged emails attaching spreadsheet files titled, in relevant part, "[Company-1] master for Bank Statements for [Company-1 CFO]."

39.    On or about January 21, 2019, ANTHONY RICCARDI, the defendant, emailed the Company-1 CFO attaching a number of documents purporting to represent the Company-1 EBS Account bank statements for 2018.

14

40.    I have reviewed these purported Company-1 EBS Account bank statements sent by ANTHONY RICCARDI, the defendant, to Company-1 and have compared them against bank records I have obtained for the Company-1 EBS Account from the bank.  Based on that review, I have determined that the bank statements sent by RICCARDI and EBS have been materially altered from the actual bank records for the Company-1 EBS Account. The altered statements did not show the numerous transfers to and from the EBS operating account and other EBS accounts, nor did they show other non-healthcare related expenditures. Instead, the altered statements listed numerous checks to create the appearance that EBS was paying healthcare claims for Company-1, even though such checks were never actually negotiated by the bank.

41.    I have reviewed the other bank statements that ANTHONY RICCARDI, the defendant, provided to Company-1, as well as bank statements provided by VANESSA BATTLE, the defendant, to the Auditor and identified similar discrepancies.

42.    I have also reviewed an email sent by ANTHONY RICCARDI, the defendant, on or about August 16, 2018 to an individual named "Gina" at an email address associated with an accounting business owned by ERIN VERESPY, the defendant. RICCARDI's email attaches two spreadsheets that have been formatted to appear as October 2016 and November 2016 bank statements showing rows of blank entries for "Checks Paid."  The account number on the altered bank statements corresponds with the account EBS used as a TPA for a different client's healthcare plan ("Company-2").  The metadata in the two spreadsheets shows that RICCARDI is the author.  On or about August 17, 2018, VERESPY emailed RICCARDI with the subject line "Gina," attaching multiple spreadsheets bearing Company-2's name.  Each of the spreadsheets have been formatted as a bank statement, but this time with multiple entries for check numbers, dates, and amounts.

43.    As part of this investigation, I interviewed an individual who worked for EBS between in or about 2011 and 2018 ("Witness-2").  Witness-2 stated that ANTHONY RICCARDI, the defendant, had asked Witness-2 at some point prior to 2016 to assist RICCARDI in recreating bank statements.  Witness-2 stated that RICCARDI had a template that RICCARDI used to convert scanned bank statements into editable word processor or spreadsheet documents.  Witness-2 assisted RICCARDI in manually inputting information into these bank statements on more than one occasion.

44.     As part of this investigation, I have also reviewed documents and records indicating that ANTHONY RICCARDI, PATRICIA RICCARDI, ERIN VERESPY, and VANESSA BATTLE, the defendants, further took steps to conceal the Claims Administration Scheme from Company-1 by providing false and fictitious copies of checks to create the appearance that certain healthcare claims were paid, when in fact they were not:

a.     For example, on or about March 2, 2017, the Company-1 CFO sent an email to BATTLE and ANTHONY RICCARDI that forwarded an inquiry received from the U.S. Department of Labor ("DOL") regarding approximately $296,260.26 in unpaid healthcare claims owed to a New York-based hospital (the "Hospital") from participants of the Company-1 healthcare plan that EBS serviced as a TPA.  The claims were dated between approximately August 2015 and September 2016.

b.     In response to this email, RICCARDI emailed the Company-1 CFO on or about March 2, 2017 stating that all of the "biggest claims" referenced by the DOL had already been paid.

c.     That same day, BATTLE emailed the Company-1 CFO and stated "Let [me] make this very clear to you.. There is not 300K in unpaid claims to date for [the Hospital]."

d.     On or about March 4, 2017, the Company-1 CFO forwarded an email exchange he had received from employees of the Hospital regarding outstanding claim balances.  In the email chain, the Hospital employees explain, in part, that "We have several claims that are unpaid and are several months old.  We contact Employee Benefit Solutions every month to follow-up.  We were originally promised payment, now we are being told to leave a message or being hung up on.  Vanessa Battle (Vice President), will not return phone calls or e-mails to both [the Hospital] and the Department of Labor."

e.     On or about March 7, 2017, RICCARDI emailed the Company-1 CFO and appeared to blame a specific provider network (the "Provider Network") for the unpaid claims to the Hospital.  RICCARDI stated, in part and in substance, that EBS originally paid the Provider Network, which ostensibly said it did not pay the Hospital because it could not identify the claimants.  RICCARDI stated that he demanded the Provider Network return the checks, which EBS received and then forwarded to the Hospital directly. RICCARDI also attached an image of a check from the Provider Network made out to EBS (care of

16

Company-1) dated March 2, 2017 for approximately $215,776.43
that contained the notation "This check is a refund of claims
funding sent to [the Provider Network] by Clients/TPAs."

f.    As part of my investigation, I provided a
copy of the $215,776.43 check referenced above to
representatives of the Provider Network, who informed me that
the purported check was fake.

g.    On or about March 13, 2017, the Company-1
CFO emailed RICCARDI requesting a "copy of the check that EBS
submitted to [the Provider Network] that was never disbursed to
[the Hospital] directly."

h.    Approximately two days later, on or about
March 15, 2017, RICCARDI forwarded the Company-1 CFO email to
BATTLE and PATRICIA RICCARDI.  In the email, RICCARDI writes, in
relevant part, "Do you think we should make more [Provider
Network] checks?  We can just make another [Provider Network]
refund check like we did on the first one?  Let me know
everyone's thoughts.  This was the e-mail from Monday that I was
telling you about Tricia."

i.    On or about March 20, 2017, RICCARDI emailed
the Company-1 CFO with the subject line "[Company-1]
Aggregate/[Hospital] [Provider Network] checks."  In the email,
RICCARDI stated, in relevant part, "Also included are the
additional [Provider Network] cleared checks that you
questioned."  The email attached a document containing a series
of scanned check images purportedly paid by EBS on behalf of
Company-1 to the Provider Network.

j.    Based on my review of bank account records
for the Company-1 EBS Account, none of the checks that RICCARDI
sent to the Company-1 CFO appeared in the actual Company-1 EBS
Account bank statements as deposited or cleared by the payee,
which leads me to conclude that these check images are also
fake.

45.    In a further effort to perpetuate the Claims
Administration Scheme, I have also learned based on my review of
reports and records in this case that beginning in or about
2017, ANTHONY RICCARDI, the defendant, misrepresented the
fiduciary funds in the Company-1 EBS Account statements as EBS
revenue (or accounts receivable) in order to receive short term
financing and cash infusions from various multiple firms.  Based
on my review of the Company-1 EBS Account bank records, I know

17

that multiple firms that specialize in merchant cash advances and accounts receivable financing withdrew approximately $5 million in funds from the Company-1 EBS Account pursuant to agreements with EBS, unbeknownst to Company-1.

46.     I have also learned that in or about May 2019, ANTHONY RICCARDI, the defendant, using a company called "Precise Medical Billings, LLC" ("PMB") entered into an accounts receivable financing agreement whereby the financing firm (the "Firm") would advance payment of any accounts receivable invoices sent by RICCARDI in exchange for a fee. The contract with the Firm included signatures by both ANTHONY RICCARDI and PATRICIA RICCARDI, the defendants, on behalf of PMB.

47.     Based on my review of records in this case, as well as my discussions with the Company-1 CFO, I have learned that ANTHONY RICCARDI, the defendant, provided the Firm with an invoice for Company-1 by PMB for approximately $273,000, in addition to invoices from several other supposed customers of PMB.   When the Firm attempted to collect on the invoice with Company-1, the Company-1 CFO confirmed that the invoice and supposed contract between PMB and Company-1 were fraudulent and contained a forged signature for the Company-1 CFO.   The Firm also told the Company-1 CFO that it was provided with an "Accounts Receivable" contact at Company-1 named "Alexandra Lynn" along with an email address that began with "billingdept" and ended with a derivation of Company-1's actual domain name. The Company-1 CFO confirmed that "Alexandra Lynn" was not an employee of Company-1.   I have also confirmed that the domain name for the "billingdept" email address is not associated with Company-1, but was instead purchased by ERIN VERESPY, the defendant, in or about May 2019.

[Continued on next page.]

18

WHEREFORE, the deponent respectfully requests that ANTHONY RICCARDI, PATRICIA RICCARDI, VANESSA BATTLE, and ERIN VERESPY, the defendants, be arrested, and that they be imprisoned or bailed, as the case may be.

/s/ Greg T. Ghiozzi  (known to Court)
GREG T. GHIOZZI
Postal Inspector
United States Postal Inspection Service

Sworn to before me through the
transmission of this Complaint by
reliable electronic means, pursuant to
Federal Rule of Criminal Procedure 4.1 this
13th day of July, 2020   (via FaceTime)

THE HONORABLE PAUL E. DAVISON
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK